IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:20CR358 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT D. McWILLIAMS, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by its counsel, Bridget M. Brennan, Acting United States Attorney, and Carol M. Skutnik, Assistant United States Attorney, respectfully submit this memorandum setting forth the United States' position regarding the sentencing of Robert D. McWilliams (hereafter "McWilliams" or "Defendant").  On July 16, 2021, McWilliams pleaded guilty to all charges set forth in the Indictment without a plea agreement, which included pleading to production and distribution of sexually explicit images of minors and juvenile sex trafficking.

The government has reviewed the Presentence Report ("PSR") submitted by the Probation Department and recognizes that the advisory Guidelines range for the offenses to which Defendant pleaded guilty is a life term of incarceration.  The government recommends a within-Guidelines term in this instance, but further states that if the Court determines that such a term is greater than necessary to comport with the purposes of sentencing, a term of no less than 40 years would be sufficient but not greater than necessary.  The reasons for the government's position are set forth in this memorandum and will be more fully stated during the sentencing hearing.  Additional reasons for the government's position, namely those relating to the privacy

1

protections afforded minor victims and codified in Title 18, United States Code, Section 3509, must be and will be submitted to the Court in a sealed filing.

## I.  Factual Background

### A.  The Identified Victims

This investigation originated in October of 2019, long after McWilliams' offense conduct began.  It revealed how McWilliams, a Catholic Priest, led the quintessential double life professing the tenants of Christianity in public while using fake identities and technology to conceal his sexual attraction to minors.  McWilliams amassed a disturbing collection of child pornography, extorted teenage boys for sexually explicit images, and provided compensation to two other teen boys in exchange for sexual acts.  Below are the victims covered by the Indictment:

| Count | Offense | Date Range | Victim/Offense Conduct |
|---|---|---|---|
| 1 | Title 18 U.S.C. § 1591(a)(1) and (b)(2): Sex Trafficking of a Minor (between 14 and 18 years old) | March 2018 through October 25, 2019 | Minor Victim #1 Age: ~15-16 years old |
| 2 | Title 18 U.S.C. § 1591(a)(1) and (b)(2): Sex Trafficking of a Minor (less than 14 years old) | March 2018 through January 31, 2019 | Minor Victim #2 Age: 13 years old |
| 3 | Title 18 U.S.C. § 2251(a): Sexual Exploitation of Children | November 26, 2017 through May 17, 2018 | Minor Victim #3 Age: 15 in some images |
| 4 | Title 18 U.S.C. § 2251(a): Sexual Exploitation of Children | May 17, 2018 through July 23, 2019 | Minor Victim #4 Age: ~17-18 years old |
| 5 | Title 18 U.S.C. § 2251(a): Sexual Exploitation of Children | May 13, 2017 through September 29, 2019 | Minor Victim #5 Age: ~9-11 years old |
| 6 | Title 18 U.S.C. § 2252(a)(1): Transportation of Child Pornography | May 15, 2018 through September 15, 2018 | 120 videos and 2 images of child pornography uploaded to Dropbox. Those files were submitted to NCMEC and only |

2

| | | | 17 videos and 1 image belong to children from 13 identified series |
|---|---|---|---|
| 7 | Title 18 U.S.C. § 2252(a)(2): Receipt and Distribution of Visual Depiction of a Minor Engaged in Sexually Explicit Conduct | January 2017 through September 2019 | McWilliams received sexually explicit images from Victims 3-5 and distributed images of Victims 3 and 4 and unknown minor female victim to the victims and their parents. |
| 8 | Title 18 U.S.C. § 2252A(a)(5)(B): Possession of Child Pornography | December 5, 2019 | Seagate External HDD that contained 12 images and 1,383 videos of CP plus an HP Spector laptop that contained 210 images and 201 videos of CP |

B.    The Defendant

Until 2017, McWilliams was a seminarian associated with St. Helen's Catholic Church in Newbury Township, Ohio, which includes a church, Teen Life Program, and an elementary school.  McWilliams was especially active in the Teen Life Program.  The families of Victims 3 through 5 are members of St. Helen's parish.  Not long after McWilliams entered their lives, the parents noticed behavioral issues with their sons and thought McWilliams, someone who appeared to have the ability to engage teenagers, might be able to help them.  McWilliams would take them to lunch, attend their functions, spend time talking with them, and bring them gifts. He would also invite himself to family dinners and show up at their homes unannounced.

In the spring of 2017, he was ordained a Catholic priest and appointed Parochial Vicar of Saint Joseph Catholic Church in Strongsville, Ohio.  St. Joseph Catholic Church is the spiritual home of over 2,880 families and hosts a robust Youth Ministry Program that serves 7th through 12th grade parishioners.  However, McWilliams chose to frequent the homes of the St. Helen's families and appeared at many activities planned for the children.  These families had no idea what McWilliams was truly up to.

C.       Execution of the State Search Warrant

McWilliams came to the attention of the Geauga County Sheriff's Office in October of 2019, after two families from the St. Helen's parish filed a report detailing how their sons were extorted online for sexually explicit images of themselves.  [Further details of these offenses will be filed separately, under seal.]  Investigator Richard Warner from the Geauga County Prosecutor's Office agreed to handle the investigation given his expertise in the investigations of crimes against children.  Inv. Warner was able to use information located on the victims' cellphones to track text message communications back to McWilliams, who was using applications like "TextMe" and "TextNow" to hide his phone number.

On December 4, 2019, Investigator Warner, and members of the Ohio Internet Crimes Against Children ("ICAC") executed a search warrant at McWilliams' living quarters at Saint Joseph Catholic Church in Strongsville, Ohio.  They seized two laptop computers, a hard disc drive, one tablet, and a cellphone.

The forensic examination of the devices revealed McWilliams' iPhone was synced to his laptop using the iTunes Back up feature.  Inv. Warner located several sexually explicit images of Victim #4 taken when he was no older than 16-years-old.  Inv. Warner also located sexually explicit images of Victim #3, taken in 2018, when he was just 16 years old.  Other text messages found on McWilliams' cellphone from November 26, 2017, when Victim #3 was 15 years old, illustrated how McWilliams extorted images from his victims.

D.       Dropbox

McWilliams's devices revealed a cloud storage container he created with Dropbox Inc. using the email address "forsafe_keeping@aol.com.  It contained three folders filled with child pornography.  Most of the files were videos and depicted prepubescent boys being anally raped,

performing oral sex or being masturbated on. Videos are the most graphic form of child pornography because they depict a continuous rape with the horror of sound. Many of McWilliams' Dropbox videos involved young boys, including toddlers, and were unusually lengthy. He also had numerous image and video files of pubescent and prepubescent boys masturbating or performing sexual acts with other males while on a webcam. McWilliams' two other Dropbox accounts contained folders labeled "Worship Music – Master Collection" and "Camera Uploads." Many of the images in those folders ironically depicted McWilliams conducting religious ceremonies and posing with families from the church.

Ohio ICAC performed a forensic evaluation on McWilliams' devices seized during the search warrant. McWilliams had a Seagate external hard drive that contained a folder named "Yaaaaas" filled with 12 images and 1,383 videos of child pornography. This folder was located among other folders labeled "Homilies and Reflections," "Psalm Bible Studies," and "Self-Evaluations." His HP laptop was found to contain 210 images and 201 videos of child pornography.

Further investigation revealed McWilliams created several email addresses that he used to send himself child pornography. For example, he sent 20 images of prepubescent boys engaged in oral sex, anal sex, or the lascivious exhibition of their genitals to himself on January 2, 2019. This method is sometimes used by collectors to store child pornography or allow access to the images on multiple devices. Among these emails were sexually explicit images of Victim #3 sent in December of 2017. Clearly it was important to McWilliams that he have access to the images he extorted from the victims. McWilliams further used his email accounts to locate males on Craigslist for sexual encounters.

E.  Sex Trafficking of Minors

The forensic examination of McWilliams iPhone and the iTunes Back up files further revealed chat messages that established McWilliams was also engaged in juvenile sex trafficking.  The first boy identified by Inv. Warner was Victim #1, a 16-year-old boy from Medina, Ohio.  Victim #1and his friend, Victim #2, were searching through the Grindr.com application when they began chatting with man named "Mike."  "Mike" offered to pay them for sex.  Victim #1 and Victim #2 were later able to identify McWilliams, known to them as "Mike," in a photo array.  [Further details of these offenses will be filed separately, under seal.]

## III.  The United States' Recommendation is Reasonable and Necessary to Comply with § 3553(a)

The recommendations of the Sentencing Guidelines are no longer mandatory but sentencing courts "must consult these Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005).  The Sentencing Guidelines are "the 'starting point and the initial benchmark.'"  *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007) (noting that the Guidelines should "be kept in mind throughout the process").  The sentencing court must conduct a two-step process: first calculating the sentence using the advisory Sentencing Guidelines, and then applying an individualized assessment under the statutory sentencing factors set forth in 18 U.S.C. § 3553(a). *United States v. Boulware*, 604 F.3d 832 (4th Cir. 2010).  These factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

18 U.S.C. § 3553(a).

According to the PSR, McWilliams has a total offense level of 43, after acceptance, and is a Criminal History Category I.  [R. 36: Sealed PSR, PageID 187].  Therefore, the advisory Sentencing Guidelines for McWilliams recommend life in prison.

### A.      Nature and Circumstances of the Offense

McWilliams' criminal conduct is multi-faceted and unprecedented.  He is a consumer of child pornography, <u>and</u> an extortionist who violated the sacrament of confession to obtain information he later used, under aliases, to seek the production of sexually explicit material from boys he was "counseling," <u>and</u> a juvenile sex trafficker.  McWilliams targeted a vulnerable population that is also our most valuable resource: our children.  His conduct is beyond serious and demands an appropriately lengthy sentence.

### B.      History & Characteristics of the Defendant

Many defendants involved in other federal crimes, such as drugs and guns, have dire family life circumstances that lead them to the all-too-predictable path of crime.  The defendant in this case experienced the antithesis of that lifestyle.  Although his parents were divorced, both remained active in his childhood.  His mother remarried several times, but McWilliams reported that he had a positive relationship with his stepfathers, and he was not exposed to domestic violence.  [R. 36: Sealed PSR, PageID 189].  He did not disclose any abuse or neglect to the PSR writer, and his mother reported he was never abused or neglected."  [Id., PageID 189-90].  The

7

Defendant's attorney did advise the PSR writer that McWilliams was speaking to a professional about those issues.  [Id.]  The defendant was raised in good neighborhoods in the Akron area, and he never witnessed any drugs or violence in those neighborhoods.  [Id.]

While committing these crimes, he had a supportive family in his mother and sister.  He reports being estranged from his brother that uses drugs.  [Id.]  He was in good overall physical health, but reports being borderline diabetic.  While incarcerated he reports chronic lower back pain, constipation, hypertension, and sciatica.  [Id., PageID 190].  He denied any mental health issues, which was corroborated by his mother.  He did make a vague reference to anxiety -related symptoms that would not be inconsistent with a person incarcerated for very serious federal charges.

It is not uncommon for offenders to allege or for observers to speculate that a person accused of child sex crimes must have been sexually abused as a child.  But both common sense and scientific research undercut such post-hoc rationalizations for why they committed crimes that mimicked their own alleged sexual abuse.

It does not require a Ph.D. to conclude that a person who experiences a traumatic event is more likely to empathize with another person who is going through similar trauma.  This same common-sense logic applies to those who suffer sexual abuse of any kind, whether childhood sexual abuse or sexual assault as an adult.  Those individuals will naturally be more empathetic towards someone who has experienced the same type of sexual abuse.  The research on empathy supports this common-sense analysis.  "Theoretically, the closer that one's own personal victimization experience matches a victim's condition (i.e., relationship context), the more one

should identify with that situation."[1]  Indeed, "those who have experienced some type of sexual victimization report more empathy than those without such experience."[2]

In a study published in 2016, researchers conducted qualitative research on male victims of sexual abuse, inquiring why they had not perpetuated the abuse on others.  "By far, the most commonly cited reason the participants gave for having not sexually offended was experiencing empathy for other people and having no desire to hurt others."[3]  When asked to explain, participants in the study made statements such as, "Experiencing pain is like putting your hand in the fire.  You don't have to tell anyone twice that they are experiencing pain.  I wouldn't want to stick someone else's hand in the fire. . . I'm aware of the pain and emotions that an abused person would go through and I don't want to put anyone else through that."[4]  The study's authors observed that "[s]uch evidence is unique as it directly contradicts the victim–offender cycle hypothesis because it demonstrates that not all victims become offenders and, in fact, the victimizing experience contributed to their status as a nonoffender."[5]  In other words, instead of making them *more* likely to offend against a child, being a victim of sexual abuse actually makes them *less* likely to offend because the natural empathy developed from such experiences deters such perpetuating behavior.  "This, coupled with the knowledge that the majority of victims do not become sexual offenders (Salter et al., 2003), adds substantially to the argument that the

---

[1] Osman SL. (2014). Participant Sexual Victimization by an Acquaintance and Gender Predicting Empathy with an Acquaintance or Stranger Rape Victim. Journal of Social and Clinical Psychology, Vol. 33, No. 8, 2014, pp. 732-742.
[2] Osman SL. (2011). Predicting rape empathy based on victim, perpetrator, and participant gender, and history of sexual aggression. Sex Roles 64, 506–515.
[3] *Id*.
[4] *Id*.
[5] *Id*.

pathway from victim to offender is not as direct as the literature would have us believe."[6] And studies have shown that "not all victims of childhood sexual abuse go on to sexually abuse others. In fact, the majority of victims do not go on to perpetuate the abuse."[7] "Furthermore, not all sexual offenders have a history of sexual abuse. Thus, 'sexual abuse history is neither a sufficient nor a necessary condition for adult sexual offending.'"[8]

These claims should also be viewed with skepticism because research has consistently shown that such self-reports by those accused of sexual offending are inherently unreliable in a statistically significant way. In 2001, a series of studies from 1978 through 1994 were examined in an article published in Federal Probation. The article explained that the three different studies showed remarkable consistency such that the following conclusions could be summarized as follows:

1. Adults will lie and understate by a factor of five to six the number of sexual crimes they have committed.
2. Adults will lie and under report their history as a juvenile sex offender.
3. Adults will lie and <u>over</u> report their history of childhood sexual victimization.
4. With polygraphs, they disclose six times as many victims and most confess that they were sexually offending as juveniles.

Hindman, J. & Peters, J.M. (2001), *Polygraph testing leads to better understanding adult and juvenile sex offenders*, Federal Probation, 65(3), 8–15. One chart puts the evidence in stark relief:

---

[6] *Id.*

[7] *Id.* (citing Jespersen et al., 2009; Thomas & Fremouw, 2009; Widom & Ames, 1994; Salter et al., 2003).

[8] *Id.* (quoting Jespersen et al., 2009, p. 190).

**TABLE F**

*Comparing the Histories of Adult Offenders Before and After Polygraph 1994–1999*

|  | Pre-Polygraph | Post-Polygraph |
|---|---|---|
| Average number of victims reported | 2.9 | 11.6 |
| Percent reporting being sexually abused as a child | 61% | 30% |
| Percent reporting sexually abusing others as a child | 27% | 76% |

As the chart makes clear in the second row, before taking a polygraph, 61% claimed to have been sexually abused as a child. But that number fell by half to 30% when the polygraph examination was administered. In other words, more than half of the defendants who claimed to have been sexually abused had lied. The article's authors summarized the situation thus: "Today, just as in 1978, adult offenders not polygraphed are very likely to minimize the history of their abusive behavior and to overstate their own histories of victimization." *Id*.

Even if there were a correlation between being a victim of child molestation and a defendant later engaging in serial, sexually exploitative conduct on children—which is not supported by logic or science—correlation is not causation. While this "correlation" may appear attractive as an explanation for inexplicable conduct, reality does not bear it out. If being sexually abused makes one more likely to offend in a like manner, why don't girls, who make up a disproportionately larger percentage of child exploitation victims, make up an equally large percentage of child exploitation offenders? In other words, if abuse begets abuse, then the large volume of female victims would result in a demonstrably larger volume of female offenders. Statistics do not bear this out. Indeed, this Court's own experience likely is instructive: How many female pedophiles has this Court sentenced as compared to males?

11

Research in this area further illustrates that a defendant's suggestion—being abused caused him to abuse—is scientifically unsupported.  "The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend.  However, there are serious limitations to this explanation."[9]  As one journal article explained it, "sexual abuse at particular ages and frequency of abuse do not of themselves necessarily lead to an increased likelihood of perpetuating abuse across generations."[10]  Indeed, "the data do not provide strong support for a cycle of sexual abuse encompassing a substantial proportion of male perpetrators."[11]

With respect to studies which have suggested that "prior victimization may have some effect in a minority of perpetrators . . . [a]nother possibility is that some sexual perpetrators may feign sexual victimization in order to gain sympathy, preferential treatment, or therapy."[12]  "There is also legitimate concern regarding the validity of many of the self-reports of pedophiles who claim to have been abused as children themselves.  These statements are often made in a legal or group treatment setting, in which pedophiles may be trying to mitigate their sentence or gain sympathy for their behavior."[13]  In fact, "[s]tudies into prevalence of childhood sexual abuse among sex offenders have produced mixed results with 8% to 60% of child molesters reporting having been sexually abused as a child.  Variability in prevalence rates across studies may be due

---

[9] Lambie, Ian, et al., *Resiliency in the victim-offender cycle in male sexual abuse*, Sex Abuse: A Journal of Research and Treatment 14(1), 43 (2002).

[10] Briggs, F. and R. Hawkins, *A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders*, Child Abuse & Neglect 20(3), 230 (1996).

[11] Glasser, M. et al., *Cycle of child sexual abuse: links between being a victim and becoming a perpetrator*, The British Journal of Psychiatry 179, 488 (2001).

[12] Glasser, M. et al., *Cycle of child sexual abuse: links between being a victim and becoming a perpetrator*, The British Journal of Psychiatry 179, 488 (2001).

[13] Hall, R.C.W., *A Profile of Pedophilia: Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues,* Mayo Clinic Proceedings 82(4), 464 (2007).

in part to differing motivations on the part of subjects to give self-serving histories."[14]
Additionally, "[p]erpetrators may lie about their actions or attempt to excuse their behavior by
pointing to their own victimization as children." [15]  Moreover, "[e]xcuse-making may be more
prevalent in settings where such behavior may be useful, such as in the early stages of therapy
(before learning that excuse-making is not acceptable) or during the trial process (perhaps under
the guidance of enthusiastic defense lawyers)."[16]  Indeed, as explained above, "when verified by
polygraph . . . the percentage of offenders who experienced sexual victimization in their own
lives drops significantly."[17]

Williams submitted a written statement for acceptance of responsibility to the PSR writer.
The statement simply read "*I admit and accept responsibility for the offenses I pled guilty to in
the Indictment.  Along with this acceptance, I want to state my shame and sorrow for having hurt
the victims, their families, and the church.*"  (R. 36: Sealed PSR, PageID 182).  The statement
rings hollow given the gravity and duration of McWilliams' crimes.  It also seems focused on the
Defendant's consequences (shame and sorrow) and not those of the victims.  In this case, we
don't have to speculate about the harm visited upon McWilliams' victims and the families that
have experienced this process with them.  The families have expressed some of those feelings in
their own words to the Court.  Indeed, many victims of sexual exploitation experience PTSD, as
explained below regarding the Adverse Childhood Events studies.

---

[14] Haywood, Thomas et al., *Cycle of Abuse and Psychopathology in Cleric and Non-cleric Molesters of Children and Adolescents,* Child Abuse & Neglect 20(12) 1234, (1996.

[15] Briggs, F. and R. Hawkins, *A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders*, Child Abuse & Neglect 20(3), 232 (1996).

[16] *Id*.

[17] Hindman, Jan et al., *Shedding Light on the Histories of Sex Offenders Using Clinical Polygraphy,* The Sexual Predator (vol. IV), 20-5 (2010); *see also* Hindman, Jan et al., *Polygraph Testing Leads to Better Understanding Adult and Juvenile Sex Offenders*, Federal Probation 65(3), 8 (2001).

On balance, the history and characteristics of McWilliams make clear that he has lived a relatively stable life with family support.  He was not corralled into this crime by a series of unfortunate life circumstances.  Rather, his actions were deliberate and methodical, and his sentence should reflect those facts.

C.     **Seriousness of the Offense, Promoting Respect for the Law, Providing Just Punishment**

There can be no question that Defendant's offenses are very serious under the law.  The known victims may not become fully aware of their thoughts and feelings until they are much older.  Others have already manifested their feelings of betrayal evidenced by their unwillingness to trust others, attend church, or discuss their faith.  The children depicted in McWilliams child pornography collection remain in a continuous loop of emotions, never able to truly heal from the original exploitation because people like McWilliams are downloading their images for sexual enjoyment.  Many of these children are now at an increased risk of falling prey to alcohol abuse, illicit drug use, sexual promiscuity, and suicide.  Research in this area is startling and demonstrates the need for a significant punishment.

In the late 1990s, the Kaiser Permanente San Diego Health Appraisal Clinic, a primary care clinic where more than 50,000 adult members of an HMO receive medical examinations, began a study to examine the long-term relationship between Adverse Childhood Experiences (ACEs) and a variety of health behaviors and health outcomes in adulthood.  First, they took a survey of adults who were members of the Kaiser HMO to determine the number of ACEs experienced.  An ACE was defined to include an experience occurring to the adult before the age of 18 such as verbal abuse, physical abuse, contact sexual abuse, a battered mother, household

14

substance abuse, household mental illness, incarcerated household members, and parental separation or divorce.  The survey data was collected in 1995 through 1997.

In early 2009, using the National Death Index mortality data, researchers analyzed how many of the 17,337 original survey respondents were deceased 10 years after the survey.  The results were startling.  "People with six or more ACEs died nearly 20 years earlier on average than those without ACEs."  David W. Brown, et al, *Adverse Childhood Experiences and the Risk of Premature Mortality*, 37 American Journal of Preventive Medicine 389-96 (2009).  In other words, if a person in the control group lived to 79.1 years old, that same person will only live to age 60.6 years old if he/she experienced six or more ACEs before the age of 18.

While it is certainly alarming to know that serious negative experiences in childhood could be correlated with such a precipitous drop in life expectancy, the ACE Study expressly observed that "[t]here are several reasons to believe that these estimates of the relationship between ACEs and premature death are *conservative*." (*Id*. at 394 (emphasis added).)  Indeed, when the initial survey was conducted in 1995 to 1997, approximately 60% of the survey respondents were already 50 years or older.  Given that fact, "it is reasonable to postulate that people who are exposed to ACEs (particularly multiple ACEs) are more likely (compared to those who are unexposed) to be aborted; die during childhood or young adulthood; be institutionalized; or be otherwise lost prior to the initiation of the ACE Study."  (*Id*. at 394-95.)  In other words, the ones who lived long enough and thrived well enough to be available for the HMO study were the hardiest of those who had experienced 6 or more ACEs; yet even that hardy group experienced a premature mortality of 20 years.  In addition, the survey respondents were of a population who were enrolled in a major health plan at that time, i.e., "predominantly white, middle-class adults." (*Id*. at 394.)  Due to these facts about the survey population, "the

association between ACEs and premature all-cause mortality would be biased downward." (*Id*. at 395.)  In other words, it is reasonable to conclude that an ACE victim's risk of premature mortality is even greater than the ACE Study results show.

Additional research using the same survey data has drilled deeper to better understand the relationship between the severity of the childhood *sexual* abuse (not just adverse childhood experiences) and the long-term health and social problems.  *See* Shanta R. Dube, et al, *Long-Term Consequences of Childhood Sexual Abuse by Gender of Victim*, 28 American Journal of Preventive Medicine 430-38 (2005).  First, the study bifurcated the population of sexual abuse victims by classifying them into "sexual abuse, no intercourse" and "intercourse."  Intercourse was defined as answering yes to the question of whether any "adult, relative, family friend, or stranger ever" attempted or actually had "any type of sexual intercourse with you (oral, anal, or vaginal)."

Using those definitions and categories, the study showed that adult women who were sexually abused in the form of intercourse as a child, were 360% more likely to attempt suicide than women who had never been sexually abused as a child. (*Id*. at 432, Table 4.)  Equally unsettling was that even the children who experienced non-intercourse sexual abuse (so-called "just fondling") were 80% more likely to attempt suicide than those who had never been sexually abused.  Sadly, this data set does not (because it cannot) include actual suicides, which undoubtedly would increase the odds described in the study.

In addition to suicide risk, non-intercourse female child sexual abuse victims were 60% more likely to use illicit drugs ("street" drugs, e.g., meth, heroin, cocaine), and 50% more likely to have alcohol problems.  Even worse, intercourse victims were 90% more likely to do each. (*Id*.)

16

Below is a chart summarizing the increased health risks to people like the victims depicted in the defendant's collection, who each experienced adverse childhood experiences while being photographed or recorded:

| | |
|---|---|
| Years of life lost | 18.5 |
| Increased risk of attempted suicide | 360% |
| Increased risk of using street drugs, e.g., meth, heroin, cocaine | 90% |
| Increased risk of adolescent pregnancy | 60% |
| Increased risk in first pregnancy resulting in fetal death | 10.2% |

Section 3553(a)(2)(A) instructs this Court to fashion a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide *just punishment* for the offense." (emphasis added).  The scientific articles interpreting the ACE Study very clearly demonstrate the profound long-term consequences of various kinds of adverse childhood experiences, especially childhood sexual abuse.  The victims involved in this case have an increased risk of attempting suicide, using illicit drugs, alcohol problems and dying prematurely.  In short, through the manipulation and exploitation of these teenagers and the consumption of images of children that were raped by others, McWilliams has forever impacted their lives in ways that could have significant potential long-term health consequences.

A significant sentence of imprisonment would therefore be both reasonable and appropriate — "just punishment" in the terms of § 3553(a)—given the consequences that these victims will likely experience due to the defendants' actions.

### D.      Adequate Deterrence & Protect the Public

Both specific and general deterrence calls for significant sentences above the mandatory minimum to send a message that engaging in sexual abuse of children that causes extensive harm will result in a federal prison term that takes one far into old age.  A long sentence is also

17

necessary to minimize the risk of harm to the public lest this Defendant return to society at an age where his physical functioning and predilections result in continued inappropriate sexual behavior.

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. *United States v. Irey*, 612 F.3d 1160, 1206 (citing *United States v. Ferber*, 458 U.S. 747, 760 (1982) (The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product); *Osbourne v. Ohio*, 495 U.S. 102, 109-10 (1990) (It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand); *United States v. Goff*, 501 F.3d 250, 261 (3rd Cir. 2007) (Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing.); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) (The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.  Consuming child pornography increases market demand.

In fact, the *Bistline* Court reversed a district court that failed to see any importance in general deterrence. *See United States v. Bistline*, 665 F.3d at 767.  The district court stated, "general deterrence . . . will have little [if] anything to do with this particular case." *Id.*  The Sixth Circuit found "that [the district court's] statement is inexplicable, and in any event conflicts with our statement that 'general deterrence is crucial in the child pornography context[.]'" Id.  (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010)).

Further, this Court must consider specific deterrence because the risk Defendant poses to children is immense.  "An analogy often used in the field may make this question easier to answer: How many people who collect baseball cards have also played the game (or would play, if given the opportunity)?  In other words, do the things we collect reflect our fantasies and interests? An answer in the affirmative seems obvious."  *Handbook of Behavioral Criminology*, p. 332, edited by Dr. Vincent B. Van Hasselt and Dr. Michael L. Bourke, Springer Intl. Publishing (2017).  Likewise:

> A similar analogy addresses online collecting behavior and involves people who download images and videos about trout fishing.  How many have spent time in the water with a rod and reel? Perhaps not all, but surely most.  Equally important, how many of the people who watch fishing videos engage in fantasy while watching them?  And this is the key point: When they view fish being pulled from scenic mountain streams, are they fantasizing about the next time they will be able to *watch* a fishing video, or the next time they will have the opportunity to *hook* a trout?  It seems clear we view and collect things that reinforce our fantasies, and we fantasize about things we would like to do.

*Id*. (emphasis added).  Thus, the public has a right to be protected from this defendant who has demonstrated a cruel desire to manipulate vulnerable children into talking about their private thoughts only to later use that information to force them into the classic Hobson's Choice[18]: continue to send pictures to a stranger of yourself masturbating or have this stranger publish your humiliation to your family and friends who don't know about your struggles.

Even though McWilliams, and others who have an overwhelming desire for children, may not be deterred even if the sentence for the crimes was life, it is also true that others would certainly not be deterred if McWilliams received a low sentence.  These offenders do talk to each other via the Internet and social media, and they are concerned enough about law enforcement

---

[18] Merriam-Webster's dictionary defines Hobson's Choice "an apparently free choice when there is no real alternative. 2: the necessity of accepting one of two or more equally objectionable alternatives."
https://www.merriam-webster.com › dictionary › Hobson'.

that they encrypt their hard drives, seek foreign websites, and use anonymous phone applications to avoid detection. In fact, McWilliams possessed an unusually heightened knowledge of the way law enforcement catches child predators and the potential penalties one faces. There is much to be gained here by a significant sentence—increased safety for our children.

E.     **Need to Avoid Unwarranted Sentencing Disparities**

This Court has encountered many cases involving the receipt, distribution, and possession of child pornography. Sadly, this Court has also seen several cases where a child was exploited for the creation of an image or exploited for commercial sex. However, it is rare to encounter such a triple threat defendant. McWilliams used technology to disguise his phone number, created secret email accounts, and used cloud storage to grow and organize his collection of child pornography. Yet, it was the non-technical aspects of his crimes that make him so much more dangerous. He was cunning, calculating and extremely cruel. Only a sociopath could accept the hospitality of a family only to disappear into another room to transmit images of a victim to his mother so he could witness the pain inflicted upon his hosts. Yet, this was just the tip of the iceberg.

Some Courts may rely on sentencing statistics when fashioning a sentence that contemplates sentencing disparities. The Government would note, however, that sentencing statistics maintained by the U.S. Sentencing Commission fall into two different categories, relative to this case. According to the USSG, Appendix A (Descriptions of Datafiles and Variables), the followings types of crimes are grouped in the two listed categories:

> Child Pornography includes the receipt or possession of materials
> involving the sexual exploitation of minors. This category
> includes offenders sentenced under §§**2G2.2** and 2G2.4 (deleted)
> of the Guidelines Manual.

> Sexual Abuse includes criminal sexual abuse, sexual abuse of a
> minor, sexual abuse of a ward, abusive sexual contact,
> transportation of minor for sex, sex trafficking of children, sex
> trafficking of adults by force, fraud or coercion, child pornography
> production, and child exploitation enterprises.  This category
> includes offenders sentenced under §2G1.1 who received a Base
> Offense Level of 34, and all offenders sentenced under §§2A3.1,
> 2A3.2, 2A3.3, 2A3.4, 2G1.2 (deleted), 2G1.3, **2G2.1**, 2G2.3, and
> 2G2.6 of the Guidelines Manual.

Id. at A-6 and A-8.

The details of the data incorporated into each category is relevant because, for example, average sentences for a child pornography defendant encompasses every type of offender from the mere possessor to the trafficker.  Defendants that produce child pornography are grouped with hands on offenders that range from touching over the clothes to rape to sex trafficking.  This method makes the statistical averages a less attractive and reliable result.  The Guidelines in this case capture many of the factors that make this case egregious.  Moreover, statistics are less informative in this case because McWilliams' crimes cover multiple offense categories.  This is not a fact pattern captured by any one sentencing statistic.  The Government submits that a within-Guidelines sentence or, alternatively, one that does not fall below a 40-year term of incarceration, would avoid unwarranted sentencing disparities.

## IV.  Lifetime supervised release is reasonable and appropriate

Regardless of the term of imprisonment, this Court should impose a term of supervised release that extends for the life of the defendant.  "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration."  *United States v. Johnson*, 529 U.S. 53, 59 (2000).  Supervised release is not a punishment in lieu of incarceration.  *See United States v. Granderson*, 511 U.S. 39, 50 (1994).  If being on supervised release were the punitive equivalent of being in prison, and if it served the just desserts function, there would be no need to put most criminals in

21

prison. *See United States v. Irey*, 612 F.3d 1160, 1210 (11th Cir. 2010). The life term

recommendation contained in Section 5D1.2(b) is evidence that recidivism rates for sex

offenders do not appreciably decline as offenders age. *See* H.R. Rep. No. 107-527, at 2 (2002)

(discussing the merits of a life term of supervised release for sexual offenders); *see also supra*

(discussing defendants over the age of 60 who have committed similar federal child exploitation

crimes). Because, in sex crimes cases, there is no reason to believe that the need for supervision

inherently decreases with time, Congress found lifetime supervised release to be appropriate, and

thus directly inserted such a recommendation into the Guidelines. *See id*. More specifically, the

passage of 18 U.S.C. § 3583(k) recognized the long-standing concerns of federal judges and

prosecutors regarding the inadequacy of the existing supervision periods for sex offenders,

particularly for the perpetrators of child sexual abuse crimes, whose criminal conduct may reflect

deep-seated aberrant sexual disorders that are not likely to disappear within a few years of

release from prison. Many of these offenders need long term or lifetime monitoring and

oversight. *See* H.R. Conf. Rep. No. 108-66, at 49-50 (2003), *reprinted in* 2003 U.S.C.C.A.N.

683, 684. A term of supervised release for life is reasonable and appropriate in this case to

achieve rehabilitative ends and to protect children from further victimization.

I. **MONETARY PENALTIES**

    A.   THE AMY, VICKY, AND ANDY CHILD PORNOGRAPHY VICTIM
          ASSISTANCE ACT OF 2018 (AVAA) GENERALLY

    The *Amy, Vicky, and Andy Child Pornography Victim Assistance Act* of 2018 (AVAA),

enacted on December 7, 2018, made several changes to existing child pornography laws,

specifically with regard to restitution. Specifically, the law: (1) provides that restitution must be

ordered for all "child pornography trafficking offenses" of no less than $3,000 per victim; (2)

imposes a new special assessment for those defendants who are convicted of certain child pornography related offenses; (3) permits victims of child pornography trafficking offenses to seek a one-time payment of $35,000 from a reserve fund; (4) amends the definition of "sexually explicit conduct" under 18 U.S.C. § 2256(2); and (5) adds 18 U.S.C. § 3509(m)(3), which allows victims, their attorneys, and any purported expert to access a victim's own sexually explicit images during any criminal proceeding.

The Government received a report from NCMEC identifying only 17 video files and 1 image file from 13 different identified series.  However, none of the identified victims have submitted a restitution request to date.  Further, to date Minor Victims 1 through 5 have not submitted a request for restitution.

B.    FINE

The Government agrees that McWilliams does not have the current ability to pay a fine in this matter.

C.    18 U.S.C. § 3014 ADDITIONAL SPECIAL ASSESSMENT

McWilliams is also subject to a mandatory $5,000 additional Special Assessment pursuant to 18 U.S.C. § 3014[19].  The statute states, in pertinent part:

> [I]n addition to the assessment imposed under section 3013, **the court shall assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under**—
>
> **(1)** chapter 77 (relating to peonage, slavery, and trafficking in persons);
>
> **(2)** chapter 109A (relating to sexual abuse);

---

[19] This provision was due to expire on September 30, 2021.  However, H.R. 5305 extended the statute until December 31, 2021.

    **(3) chapter 110 (relating to sexual exploitation and other abuse of children)**;

    **(4)** chapter 117 (relating to transportation for illegal sexual activity and related crimes) ...

    18 U.S.C. § 3014(a) (emphasis added).

These assessments are deposited in the Domestic Trafficking Victims' Fund and awarded as grants or enhanced programming for victims.  18 U.S.C. §§ 3014(c) and (e)(1).  Because the defendant has been convicted of an offense under Chapter 110, the Court must impose this additional special assessment unless it finds he is unable to pay; however, both the defendant's current and <u>future</u> financial status is to be evaluated when making the indigency determination under § 3014.  See *United States v. Shepherd*, 922 F.3d 753 (6th Cir. 2019).  See also *United States v. Janatsch*, 722 F. App'x 806, 810-11 (10th Cir. 2018).  That is, negative net worth at the time of sentencing is not dispositive of the issue.  *United States v. Kelley*, 861 F.3d 790, 801-802 (8th Cir. 2017).  If "at some point" a defendant would be able to pay the Additional Special Assessment, "[t]his ability to earn money in the future preclude[s] a finding of indigence for purposes of § 3014."  *Id*.

    McWilliams future ability to pay this special assessment will likely depend on the length of his prison term.  He does have a high school diploma, a college degree in philosophy, and a master's degree in theology.  McWilliams could certainly not return to his current line of work but his history does demonstrate his mastery of the written and spoken word and his ability to maintain employment.

## VI.   Conclusion

    This Court has the opportunity to bring security to the community—both here in Cleveland and in the larger community on the internet — by ensuring that children do not have to worry

about being targeted by a predator such as McWilliams for a very long time.  This Court can also provide the victims and their families with closure by imposing a punishment that assures the Defendant will not harm them again.  The lives of child pornography victims are forever changed in the most profound ways.  And this Defendant's life should be changed as well—by spending time behind bars for a sentence commensurate with the harm these victims have suffered and will continue to suffer for the rest of their lives.

Respectfully submitted,

BRIDGET M. BRENNAN
ACTING UNITED STATES ATTORNEY

/S/ *Carol M. Skutnik*
Carol M. Skutnik (OH: 0059704)
Bridget M. Brennan (OH:0072603)
Assistant U.S. Attorneys
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Tel. No. (216) 622-3785/3810
E-mails: carol.skutnik@usdoj.gov and
bridget.brennan@usdoj.gov

## **CERTIFICATE OF SERVICE**

I certify that on November 2, 2021, a copy of the foregoing Government's Sentencing Memorandum was filed electronically under seal.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt and a copy of the document will be sent by electronic mail to defense counsel.

/s/ Carol M. Skutnik
Assistant U.S. Attorney